# IN THE UNITED STATES DISTRICT COURT FOR THE
# EASTERN DISTRICT OF VIRGINIA
# RICHMOND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>BRUCE H. MATSON,<br><br>*Defendant.* | Case No. 3:21CR79 |

## STATEMENT OF FACTS

The parties stipulate that the allegations contained in the Criminal Information and the following facts are true and correct, and that had this matter gone to trial, the United States would have proven each of them beyond a reasonable doubt.

1. Between on or about August 25, 2019, and on or about November 25, 2019, within the Eastern District of Virginia and elsewhere, the defendant, BRUCE H. MATSON, did corruptly influence, obstruct and impede, and endeavor to influence, obstruct and impede, the due and proper administration of the law under which a pending proceeding was being had before an agency of the United States, that is the United States Trustee Program.

2. The United States Trustee Program is the component of the Department of Justice responsible for overseeing the administration of cases and private trustees under 28 U.S.C. § 586 and 11 U.S.C. § 101, *et seq.* The Program has broad administrative, regulatory and enforcement authority to promote the integrity and efficiency of the bankruptcy system for the benefit of all stakeholders—debtors, creditors, and the public. As such, the Program is an agency of the United States as defined by 18 U.S.C. § 6.

I.     **Embezzlement from LandAmerica Financial Group Bankruptcy**

3.     Defendant BRUCE H. MATSON was an attorney who practiced bankruptcy law at the Richmond, Virginia-based law firm LeClairRyan.

4.     LandAmerica Financial Group, Inc. (LFG), was one of the largest title insurance companies in the United States.  Headquartered in Glen Allen, Virginia, LFG owned numerous subsidiaries that provided additional services related to real estate transactions.

5.     In or about November 2008, LFG filed for Chapter 11 bankruptcy protection in the U.S. Bankruptcy Court for the Eastern District of Virginia, Richmond Division, Case No. 08-35994-KRH.

6.     In or about November 2009, the Bankruptcy Court approved a Joint Chapter 11 Plan that had been agreed to by the majority of LFG's creditors.  The Plan established a liquidating trust (the LFG Liquidation Trust or the Trust) to facilitate the liquidation of LFG's remaining assets and the orderly distribution of those assets to creditors.

7.     Defendant BRUCE H. MATSON was appointed the LFG Liquidation Trustee.  In that role, MATSON served as the fiduciary responsible for administering the LFG Liquidation Trust.

8.     As LFG Liquidation Trustee, MATSON retained numerous professionals to assist him in administering the Trust.  For example, MATSON retained Company A, a global business consulting firm, to serve as the LFG Liquidation Trust's financial advisor.  Individual A was a Managing Director in the Richmond office of Company A who was responsible for the LFG Liquidation Trust engagement.  MATSON also retained attorneys at his own law firm LeClairRyan to represent him in his role as Liquidation Trustee.

2

9. At MATSON's direction, employees of Company A and LeClairRyan regularly interacted regarding the progress of the liquidation. For example, a LeClairRyan employee maintained the Trust's checkbook and made distributions from the account at MATSON's direction. In turn, employees of Company A reviewed the ledger maintained by LeClairRyan (referred to as a Form 2) to track deposits into and expenditures out of Trust accounts. Each bank account associated with the LFG Trust (or with a subtrust representing a former LFG subsidiary) was memorialized in its own Form 2.

10. The Plan also established an Oversight Committee composed of LFG's two largest unsecured creditors. During the course of the liquidation, MATSON sought approval from the Oversight Committee for various decisions and actions, including but not limited to the Trust's annual operating budgets, the liquidation of Trust assets, and distributions from the Trust.

11. In or about January 2015, MATSON used the Trust's tax identification number to open a bank account in the name of the LFG Liquidation Trust at First Capital Bank (the Fraudulent Trust Account), a financial institution headquartered in Glen Allen, Virginia. In doing so, MATSON misrepresented that the account was an LFG Liquidation Trust account. In fact, the actual LFG Liquidation Trust's accounts were maintained at Union Bank, a financial institution headquartered in California.

12. MATSON was the sole signatory on this Fraudulent Trust Account. He did not disclose the existence of this account to any Trust professional. Thus, there was no corresponding Form 2 or official record provided to Trust professionals to track deposits into and expenditures out of this account.

13. Between January 2015 and October 2015, on at least three occasions, MATSON deposited LFG Trust assets into the Fraudulent Trust Account for his own personal use.

14. At the time he opened the Fraudulent Trust Account, on or about January 30, 2015, MATSON deposited his $240,000 fixed fee for LFG Trustee services rendered in 2014. At the exact same time, MATSON also deposited into the Fraudulent Trust Account a $3,619.71 check payable to the LFG Liquidation Trust. This latter deposit constituted a payment to the LFG Trust from a firm that had purchased remnant assets from the Trust with the agreement to regularly pay the Trust a portion of the funds derived from locating and realizing those assets.

15. In or about May 2015, an entity holding $537,163.62 payable to the LFG Liquidation Trust contacted MATSON seeking instructions for how to disburse the money. On or about May 6, 2015, MATSON instructed the entity to wire the money to the Fraudulent Trust Account. Accordingly, on or about May 11, 2015, more than half a million dollars belonging to the LFG Liquidation Trust was wired into the Fraudulent Trust Account. By that time, MATSON had changed the address associated with the Fraudulent Trust Account from his office address to his home address.

16. On or about August 25, 2015, MATSON deposited into the Fraudulent Trust Account a $9,146.89 check payable to the LFG Liquidation Trust—another payment from the remnant-asset firm to the Trust.

17. In or about September 2015, MATSON, Individual A, and other employees of Company A began to prepare in earnest for a final distribution to Trust creditors and the closing of the bankruptcy. The Chapter 11 Plan called for a six-year wind down period to follow the final distribution to creditors. Accordingly, to calculate the amount of the final distribution to creditors, MATSON and his financial advisors first had to determine how much money they needed to reserve for the six-year wind down period.

18. On or about November 30, 2015, MATSON mailed a letter and final report to the Oversight Committee. In this letter, MATSON reported that he would make a final distribution to all LFG creditors equal to 1.3% of total unsecured claims in the first week of December 2015. MATSON also acknowledged that the Chapter 11 Plan required that he retain a vast amount of records for six years.

19. MATSON attached a Wind Down Budget to his November 30, 2015 letter, which specified the amount of money to be retained for the wind down period. According to the Wind Down Budget, "The cash needs for wind down costs on January 1, 2016 are estimated to be $3.1M." The Budget contained two principal costs for the wind down period: (1) data retention and storage; and (2) professional fees.

20. Regarding professional fees, the Budget specifically indicated that MATSON would be paid $540,000 in fixed fees over the six-year wind down period as follows:

| 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | **Total** |
|------|------|------|------|------|------|-----------|
| $120,000 | $120,000 | $90,000 | $90,000 | $60,000 | $60,000 | **$540,000** |

21. The Wind Down Budget also listed the LFG Trustee's "ongoing services" for the wind down period, including "Distribution of Remaining Funds, if any, to charity."

22. After sending his letter and final report to the Oversight Committee proposing a 1.3% final distribution and $3.1 million budget for the wind down, at or about 10:00 p.m. on November 30, 2015, MATSON and Individual A drafted the following language to be inserted into the Wind Down Budget's "Statement of Significant Assumptions":

> The LFG Trustee believes this Wind Down budget is reasonable and appropriate given the ongoing requirements to retain records, file tax returns, and respond to inquiries, among others, for six years after the closure of the Trust. See below under "Data Retention Costs" and "Professional Fees" for a detailed list of ongoing services. Despite review and analysis by the financial advisor, costs could be more or could be less. If there are costs incurred (e.g., document retention or professional fees) in excess of amounts budgeted, the Liquidation

> Trustee and/or his professional will waive any unpaid fees to fund those expenses. If there are residual funds remaining after six years, after the payment of $100,000 to a 501(c)(3) charitable organization(s), the Oversight Committee has approved the payment by the Liquidation Trustee of additional compensation to the Dissolution Trustee and professionals in his discretion.

This paragraph was not included in the version of the Wind Down Budget sent to the Oversight Committee on November 30, 2015.

23. The new paragraph also was inconsistent with the draft Motion for a Final Decree and a proposed Final Decree previously prepared by MATSON's counsel. MATSON and Individual A understood the new paragraph contradicted the draft court filings. Indeed, at or about 9:28 a.m. on December 1, 2015, Individual A sent an email to MATSON pointing out the discrepancy and asked, "you ok with that language?" MATSON instructed Individual A not to amend the filings.

24. Accordingly, on or about December 1, 2015, MATSON's counsel filed a Motion for a Final Decree to close the LFG bankruptcy. Counsel attached several exhibits to the Motion, including a spreadsheet detailing the final distributions to unsecured creditors, the final version of the Wind Down Budget (which included the new paragraph not previously provided to the Oversight Committee), and a proposed Final Decree.

25. Paragraph 15 of the Motion for a Final Decree stated: "All assets of the Terminating Trusts have been distributed according to the terms of the Plans. As provided in the Winddown budget contained in Appendix A-1, Exhibit 8a, to the extent there are any reserved funds remaining, the Terminating Trusts seek authority to pay such residual amounts to a charitable organization under section 501(c)(3) of the Internal Revenue Code."

26. On or about December 22, 2015, the Bankruptcy Court endorsed and entered the proposed Final Decree, which "ORDERED that the Terminating Trusts are authorized to pay any

6

unused, reserved funds to a charitable organization qualified under section 501(c)(3) of the Internal Revenue Code."

27. Between in or about September 2015 and in or about December 2015, MATSON made and caused to be made material misrepresentations and fraudulent omissions to other Trust professionals, LFG creditors, and the Bankruptcy Court so that he could divert residual funds to himself and others after the close of the LFG Bankruptcy when he would no longer be subject to scrutiny by LFG creditors and the Bankruptcy Court. In particular, MATSON misrepresented both the amount of money actually retained in Trust accounts following the final distribution to creditors, and the amount of money actually needed to wind down the LFG Liquidation Trust.

28. In 2015, in advance of the closing of the LFG bankruptcy case, MATSON entered into an agreement with LeClairRyan that would entitle MATSON to a share of the total flat fees paid for his work during the wind down period.

29. On or about January 5, 2016, MATSON signed over a $240,000 check from the Fraudulent Trust Account to LeClairRyan. This transfer represented MATSON's payment to LeClairRyan of his 2014 fixed Trustee fee that he had used to open the Fraudulent Trust account.

30. Shortly after the Bankruptcy Court entered the Final Decree, MATSON calculated LeClairRyan's share of the entire amount of his fixed fee for the wind down period, pursuant to the above-described fee agreement. On or about March 7, 2016, MATSON wrote a $225,445 check payable to LeClairRyan from the Fraudulent Trust Account with the memo line of the check reading "LR share LFG Bonus." Then, on or about April 20, 2016, MATSON wrote a $225,445 check payable to Bruce H. Matson from the Fraudulent Trust Account with the memo line of the check reading "LFG Bonus."

31. On or about January 10, 2017, MATSON wrote a $240,000 check payable to Bruce H. Matson, Trustee from the Fraudulent Trust Account. The memo line of the check read "Trustee Fee 2016."

32. Shortly thereafter, on or about January 29, 2017, MATSON was paid $120,000 from the LFG Liquidation Trust for his 2016 fixed fee for the wind down period.

33. In or about February 2017, the original $240,000 check that MATSON used to open the Fraudulent Trust Account in January 2015 appeared on a "stale check report" for the LFG Liquidation Trust account, meaning the Trust's accounting system did not indicate the check had been negotiated. When Trust professionals asked about the check, MATSON falsely claimed that he never cashed the check. Eventually, on or about, February 2, 2018, MATSON was paid another $240,000 from the LFG Liquidation Trust for his 2014 fixed Trustee fee. The memo line of the check read "Jan-Dec 2014." MATSON subsequently deposited this check into an account opened in the name of "Matson Consulting LTD" at South State Bank, a financial institution headquartered in South Carolina.

34. On or about January 3, 2018, MATSON directed the payment of $10,000 and $20,000 bonuses to two LeClairRyan paralegals on checks written from the LFG Liquidation Trust account.

35. On or about November 13, 2018, MATSON directed the issuance of a $350,000 check payable to LeClairRyan from the LFG Liquidation Trust account and directed that the memo line of the check, also reflected on the Form 2 for the LFG Liquidation Trust account, indicate that the payment was a "Case Performance Bonus." In fact, MATSON had entered into an agreement with LeClairRyan that this money would be used for MATSON's own benefit to

repay a loan encumbering a life insurance policy in his name and to increase monthly payments to MATSON under a Transition to Retirement Agreement he had with the law firm.

36. On or about January 9, 2019, MATSON directed a wire transmission of $1.5 million from the LFG Liquidation Trust account to an account controlled by Individual A, who had since left Company A. On the handwritten wire transmission form, MATSON misrepresented the purpose of the wire transmission was "Payment of Fees," which was then added to the Form 2 for the LFG Liquidation Trust account.

37. On or about January 25, 2019, MATSON directed several payments out of the LFG Liquidation Trust Account, including a $100,000 payment to a charity (as prescribed by the language he and Individual A had inserted into the Wind Down Budget); $5,000 payments to each of the two paralegals; and $25,000 to counsel for the Trust.

38. Thereafter, on or about February 13, 2019, MATSON directed the issuance of a $180,000 check payable to "Bruce H. Matson, Trustee" from the LFG Liquidation Trust account, constituting the remainder of his fixed fees for the wind down period through 2021.

39. That same day, MATSON directed the issuance of a $1 million check payable to "Matson Consulting, LTD" from the LFG Liquidation Trust account. Thereafter, MATSON deposited the $1 million check into the Matson Consulting, LTD account at South State Bank. On or about April 2, 2019, MATSON transferred the $1 million he obtained from the LFG Liquidation Trust to a personal investment account at Davenport & Company.

40. On or about April 18, 2019, MATSON directed the issuance of a check for the remaining balance in the LFG Liquidation Trust account ($341,953.32) payable to "Matson Consulting, LTD." Thereafter, MATSON deposited that check into an account in the name of Matson Consulting, LTD, Bruce H. Matson at South State Bank.

## II. Embezzlement from Forefront Investments Bankruptcy

41. On or about March 20, 2007, the U.S. Commodity Futures Trading Commission (CFTC) brought an enforcement action against Forefront Investments Corporation d/b/a CFG Trader (Forefront) in the U.S. District Court for the Eastern District of Virginia, Case No. 3:07-cv-152-REP.

42. During those proceedings, the District Court appointed MATSON to act as Receiver for Forefront. On or about February 13, 2008, the District Court authorized MATSON to take Forefront into bankruptcy proceedings.

43. On or about July 1, 2008, MATSON, acting as a "Debtor Designee," filed a Chapter 11 bankruptcy petition on behalf of Forefront in the U.S. Bankruptcy Court for the Eastern District of Virginia, Case No. 08-33077-DOT. During the Forefront Chapter 11 proceeding, MATSON, on behalf of Forefront, commenced an adversarial proceeding against one of Forefront's former executives and obtained a default judgment in the amount of approximately $354,520, plus post-judgment interest and the actual post-judgment costs of collection, including attorney fees. MATSON did not pursue execution of that judgment during the pendency of the Forefront bankruptcy case.

44. On or about June 28, 2011, MATSON, on behalf of Forefront, directed the filing of a Final Account and a Second Final Report and Motion for Final Decree in the Chapter 11 proceeding. In those filings, MATSON represented that the Forefront estate held only $400, but he also noted the estate retained the right to recover funds by executing the $354,520 judgment against the former executive. MATSON represented that, if any recovery were made on that judgment, the first $20,182.80 would be used to satisfy an administrative claim held by LeClairRyan for legal fees with any remaining funds going toward payment of subordinated

unsecured claims. MATSON represented that the Forefront estate had at least one such subordinated unsecured creditor, whose outstanding unpaid claim totaled $90,000.

45. On or about July 25, 2011, the Bankruptcy Court entered a final decree closing the Forefront bankruptcy case.

46. Approximately three years later, in or around March 2015, MATSON presented the judgment as an investment opportunity to his partners at Muirfield Capital, a privately held company that MATSON shared ownership of with four other individuals, including Individual A. The Muirfield Capital partners determined not to "buy" the judgment from the Forefront estate but instead to finance the litigation costs for executing the judgment against the former executive. MATSON intended to hire the law firm of one of his Muirfield Capital partners on a contingent-fee basis to coordinate the litigation, which also would require the hiring of a Florida-based law firm to execute the judgment where the former executive resided. Accordingly, the Muirfield Capital partners agreed to pay $5,000 to cover the initial costs of litigation in exchange for the first $6,500 obtained against the former executive.

47. On or about August 24, 2015, at MATSON's direction, the Florida-based firm registered the judgment in the U.S. Bankruptcy Court for the Southern District of Florida.

48. By on or about August 10, 2016, the Florida-based law firm, working at MATSON's direction, negotiated a settlement of the judgment in the amount of $70,000, which was to be divided as follows: $17,000 to the Florida-based law firm; $6,250 to Muirfield Capital; $23,375 to the Muirfield Capital partner's law firm; and $23,375 to the Forefront estate.

49. MATSON directed that the $23,375 check written for the benefit of Forefront be made payable to "Bruce H. Matson, Trustee." That check was mailed by the Florida-based law firm to the Muirfield Capital partner's law firm in Virginia, on or about August 12, 2016.

50. On or about September 7, 2016, MATSON deposited the $23,375 check into the Fraudulent LFG Trust Account at First Capital Bank.

51. MATSON did not direct the payment of the $23,375 towards the Forefront estate's outstanding debts to LeClairRyan or outstanding unsecured creditor. Instead, MATSON kept and used those funds for his own personal purposes.

52. Accordingly, MATSON misappropriated the following bankruptcy assets to be used for his own personal purposes:

   a. A $3,619.71 check payable to the LFG Liquidation Trust deposited into the Fraudulent Trust Account on January 30, 2015;

   b. A $537,163.62 wire transmission payable to the LFG Liquidation Trust deposited into the Fraudulent Trust Account on May 11, 2015;

   c. A $9,146.89 check payable to the LFG Liquidation Trust deposited into the Fraudulent Trust Account on August 26, 2015; and

   d. A $23,375 check belonging to the Forefront estate deposited into the Fraudulent Trust Account on September 7, 2016; and

   e. A $240,000 check payable to Bruce H. Matson, Trustee deposited into a Matson Consulting LTD account on February 5, 2018, constituting the duplicative payment of MATSON's 2014 fixed Trustee fee.

53. Additionally, between January 2018 and April 2019, MATSON, with the assistance of Individual A, paid to MATSON, Individual A, and others more than $3.2 million in residual funds from the LFG Liquidation Trust, which depleted the Trust's account. Through these payments, MATSON received more than $1.3 million directly plus the $350,000 paid to LeClairRyan for his own benefit. MATSON directed these payments in addition to the $540,000 fixed fee budgeted to him in the Wind Down Budget. Indeed, the total amount MATSON paid to himself and other Trust professionals in bonuses exceeded the entire $3.1 million supposedly retained for the wind down period.

**III. Obstruction of Investigation of Bankruptcy Embezzlement Allegations**

54. In or about August 2019, as LeClairRyan was preparing to file its own bankruptcy petition, an employee of Company A learned that there was no more money remaining in the LFG Liquidation Trust account at Union Bank even though there were more than two years left in the wind down period. When asked by Trust professionals about the whereabouts of the LFG Liquidation Trust funds, MATSON mispresented that the money was still held in escrow but that he had simply moved the money to a different bank due to high bank fees and an issue with the Trust's tax identification number. MATSON later misrepresented that he had retained Individual A as a separate financial advisor to supplement the work of Company A and that the $1.5 million wire transfer to Individual A was a portion of the escrow, not a payment. Company A subsequently advised MATSON that it would be notifying the Bankruptcy Court.

55. Before Company A made any notification, on or about August 26, 2019, MATSON and Individual A filed letters with the Bankruptcy Court that contained several false and misleading statements, including MATSON's claim that $2.8 million in Trust funds remained in escrow. In fact, when Matson and Individual A submitted their letters, all the money remained in personal accounts controlled by MATSON and Individual A.

56. The day before MATSON and Individual A filed these letters, on or about August 25, 2019, the U.S. Trustee's Office in Richmond, Virginia, received a report of alleged misappropriation of LFG Trust funds. Thereafter, the U.S. Trustee's Office conducted an inquiry into the allegation as well as the representations MATSON and Individual A made in the letters they filed with the Bankruptcy Court. By virtue of the United States Trustee Program's supervisory authority in Chapter 11 bankruptcy cases, the U.S. Trustee's inquiry constituted a "pending proceeding."

57. In response to the U.S. Trustee's inquiry, MATSON made additional false and misleading statements, including repeating the misrepresentation made in his letter to the Court that LFG Trust funds remained in escrow and that Individual A received a portion of the funds as a "substitute trustee" for the Trust.

58. On or about October 16, 2019, MATSON appeared before the Bankruptcy Court and made more misleading statements, including that he made the questioned disbursements from the LFG Liquidation Trust account because of bank fees, tax identification issues, and to reduce concentration risk.

59. On or about November 25, 2019, the Bankruptcy Court entered an Order appointing a successor Trustee for LandAmerica Financial Group bankruptcy.

60. The actions taken by the defendant, as described above, were taken willfully and knowingly. The defendant did not take those actions by accident, mistake, or with the belief that they did not violate the law.

61. The preceding only includes those facts necessary to establish the defendant's guilt as to the offense to which he is entering a guilty plea. It does not necessarily reference all information known to the government or the defendant about the criminal conduct at issue.

RAJ PAREKH
ACTING UNITED STATES ATTORNEY

By: *Katherine Lee Martin* (signature)
Katherine Lee Martin
Kevin S. Elliker
Assistant United States Attorneys

After consulting with my attorney and pursuant to the plea agreement entered into this day between myself and the United States, I stipulate that the above Statement of Facts is true and accurate, and that had the matter proceeded to trial, the United States would have proved the same beyond a reasonable doubt.

_____
BRUCE H. MATSON
Defendant

I am Bruce H. Matson's attorney. I have carefully reviewed the above Statement of Facts with him. To my knowledge, his decision to stipulate to these facts is an informed and voluntary one.

_____
Danny C. Onorato, Esquire
Counsel for Defendant

_____
Brandon M. Santos, Esquire
Counsel for Defendant