**IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Richmond Division**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No.  3:21cr79-JAG |
| | ) | |
| BRUCE H. MATSON, | ) | |
| | ) | |
| *Defendant*. | ) | |

**POSITION OF THE UNITED STATES WITH RESPECT TO SENTENCING**

The United States of America, through its attorneys, Jessica D. Aber, United States Attorney, and Thomas A. Garnett, Assistant United States Attorney, hereby submits its position with respect to sentencing for defendant Bruce H. Matson.  The United States has reviewed the Presentence Investigation Report (PSR) and does not dispute any of the facts or factors set out therein.  The defendant's applicable guideline range, based on his Total Offense Level of 21 and his Criminal History Category I, is 37 – 46 months.  PSR ¶¶ 80-81.  Based on the factors in 18 U.S.C. § 3553(a), the United States believes a sentence consisting of 46 months' imprisonment and a fine of $250,000 is appropriate.

**BACKGROUND**

The defendant was charged in a single-count Criminal Information filed on July 14, 2021. Dk. No. 1, PSR ¶ 1.  The Information charged the defendant with Obstruction of an Official Proceeding (in violation of 18 U.S.C. § 1505).  *Id.*  The defendant plead guilty to the Criminal Information on July 22, 2021, and sentencing was scheduled for May 12, 2021.  PSR ¶ 3.

That charge stemmed from the defendant's furious but ultimately unsuccessful attempts to conceal a course of criminal conduct that spanned from 2015 to 2019, during which time the

defendant used his position as a court-appointed fiduciary to embezzle, misappropriate, and dissipate more than $4,000,000 from the bankruptcy trust he had been entrusted with.

The defendant was a longtime bankruptcy law practitioner at the Richmond-based law firm of LeClair Ryan when the Bankruptcy Court appointed him as the Liquidation Trustee for the LandAmerica Financial Group (LFG) bankruptcy proceeding pending before the Court. As a court-appointed fiduciary, the defendant was responsible for administering the LFG Liquidation Trust—that is, overseeing and facilitating the distribution of LFG's remaining assets to LFG's numerous creditors.

Instead, the defendant utilized his knowledge of the bankruptcy system, his control over the LFG Trust, and the discretion entrusted in him by virtue of his appointment to embezzle approximately $800,000 from the LFG Trust; manipulate the Trust's budget for the wind down period; and capitalize on those budget manipulations and misrepresentations by siphoning away more than $3.2 million of the LFG bankruptcy estate's assets for personal payments to himself and others. The defendant's self-dealing drained the entirety of the LFG Trust account by April of 2019—more than two years before the Trust's wind down period was set to expire.

The collapse of the defendant's law firm produced—for the defendant, at least—an unwelcome review of the law firm's active engagements (which included the defendant's management of the LFG Liquidation Trust). Aware that close scrutiny would expose his criminal conduct, the defendant engaged in a course of obstructive conduct. The defendant's efforts to conceal his conduct included filing letters with the Bankruptcy Court that contained deliberate misrepresentations; attempting to mislead and/or pressure other individuals; making misrepresentations to the U.S. Trustee's Office; and appearing before the Bankruptcy Court to personally deliver additional misrepresentations to the Court. Those efforts came to naught,

however, failing to forestall the appointment of a Successor Trustee for the LFG Trust and a federal criminal investigation into the defendant's long-running and lucrative scheme.

To the defendant's credit, he has since made full restitution to the LFG Successor Trustee. *See* PSR ¶ 21. There are, accordingly, no outstanding restitution obligations in this case.

## POSITION ON SENTENCING

Following the Supreme Court's decision in *United States v. Booker*, 543 U.S. 220 (2005), the Sentencing guidelines are "effectively advisory." *Id.* at 245. Nonetheless, the advisory nature of the Guidelines "does not mean that they are irrelevant to the imposition of a sentence." *United States v. Moreland*, 437 F.3d 424, 432 (4th Cir. 2006); *see also United States v. Green*, 436 F.3d 449, 455 (4th Cir. 2006). Indeed, the Guidelines "seek to embody the Section 3553(a) considerations, both in principle and in practice." *Rita v. United States*, 551 U.S. 338, 350 (2007). Thus, a sentencing court "must consult [the] Guidelines and take them into account when sentencing" to "provide certainty and fairness in meeting the purposes of sentencing, [while] avoiding unwarranted sentencing disparities." *Booker*, 543 U.S. at 264 (internal quotation omitted); *United States v. Biheiri*, 356 F. Supp. 2d 589, 593 (E.D. Va. 2005).

A sentencing court should first calculate the range prescribed by the sentencing guidelines after making the appropriate findings of fact. *See United States v. Hughes*, 401 F.3d 540, 546 (4th Cir. 2005). Following that calculation, a sentencing court must then "consider that range as well as other relevant factors set forth in the guidelines and those factors set forth in [18 U.S.C.] § 3553(a) before imposing the sentence." *Id.*

The PSR correctly calculates a total offense level of 21, a Criminal History Category of I,

and a guidelines range of 37 – 46 months' imprisonment.[1]  Based on the Section 3553(a) factors, the United States believes a sentence comprising 46 months' imprisonment and the statutory maximum fine of $250,000 is appropriate.

### I. Nature and Circumstances of the Offense

The defendant's offense conduct was deliberate, long-running, and carefully considered. Over the course of a four-year period, the defendant designed and executed a multi-step and multi-faceted scheme to defraud the LFG Liquidation Trust of as much money as possible. Between January of 2015 and April of 2019, the defendant successfully misappropriated more than $4,000,000 from the Trust – diverting the bulk of those siphoned-off or embezzled funds into bank accounts that he controlled; transferring some to his associates; and directing the remainder to his law firm to settle a personal debt. The defendant used different methods to complete his draining of the Trust account—embezzling some funds by re-directing checks intended for the Trust, drawing duplicative payments from the Trust, and depleting the Trust's wind down budget with payments to himself and others.

The length, scope, and complexity of the defendant's fraud schemes (and subsequent obstruction) are well-documented in the Statement of Facts and the PSR. Rather than attempt to re-summarize or further condense the defendant's voluminous misconduct, the United States focuses on certain aggravating aspects of the defendant's offense conduct. The United States respectfully submits that consideration of these issues—in addition to the overall breadth and audacity of the defendant's offense conduct—militates in favor of a sentence at the top end of the defendant's properly computed guideline range.

---

[1] This offense level includes the additional 1-point reduction for acceptance of responsibility under U.S.S.G. § 3E1.1(b). The United States moves for the 1-point reduction by separate filing.

4

### 1. *Abuse of Trust*

That the defendant was able to commit these frauds so successfully is a testament to the depth and scope of his betrayal of the Bankruptcy Court's trust. The defendant was a known, trusted entity to the Bankruptcy Court in November of 2009 – an experienced bankruptcy law practitioner; a veteran of other court appointments in bankruptcy proceedings; a financially successful partner at a large law firm. The decision to entrust the defendant with the fiduciary position of Trustee in the sprawling, high-value LFG bankruptcy was, on its face, an eminently reasonable decision. Over the next decade, however, the defendant chose to abuse both his position as Trustee and his extensive experience in bankruptcy proceedings in order to drain the Trust's assets through embezzlement and self-dealing.

The defendant's status as Trustee endowed him with the authority and discretion to make numerous and far-reaching decisions on behalf of the Trust. The defendant used that latitude and authority to create a fraudulent bank account using his access to the Trust's financial information; communicate directly with the Trust's debtors in order to re-direct their payments to that fraudulent account; and design and implement a wind down budget tailored to accommodate his future dissipation of Trust assets. The defendant's long expertise in bankruptcy matters ensured that he knew when and where his opportunities for grift lay. He understood that the diminishing scrutiny that would accompany the wind down period offered a potential windfall, and so he designed an oversize wind down budget larded with discretionary "cost-saving" opportunities that he knew he could subsequently exploit (destroying documents early to free up budgeted-for document storage fees, e.g.). And finally, the defendant's knowledge that he enjoyed the trust and confidence of the Court and his fellow bankruptcy law practitioners allowed him to operate his scheme freely and confidently—going so far as to simultaneously design and execute a side-hustle fraud in the

5

Forefront Investments bankruptcy, and repurposing his fraudulent LFG bank account to receive the purloined Forefront funds.[2]

The Bankruptcy Court placed its trust in the defendant's probity and professionalism—and the defendant chose to abuse that trust in calculated and cynical fashion.

### 2. *Management of Others*

The defendant was able to dissipate a significant portion of the Trust's assets through his own initiative, experience, and authority—he needed no assistance, for instance, to execute the embezzlement portion of his scheme (re-routing checks intended for the Trust to his shadow bank account). Likewise, the defendant's deception in his (successful) pursuit of a duplicative payment for his $240,000 fixed 2014 Trustee fee was a similarly one-man operation.

For the purposes of dissipating the Trust's assets through and during the course of the wind down period, however, the defendant required the cooperation of another party—ideally, a compliant subordinate. The defendant found that person in the Managing Director of the business consulting firm that the defendant had selected to serve as the Trust's financial advisor. That financial advisor ("Individual A") proved to be as pliant as the defendant could have hoped, and the defendant was able to create and present to the Oversight Committee a wind down budget that enjoyed the appearance of fair-minded propriety (presumably, it had been scrutinized and considered by the financial advisor). In fact, however, it was a document tailored first and foremost to accommodate the defendant's interest in future theft: misrepresenting both the amount of money actually retained in the Trust's accounts following the final distribution to creditors and the amount of money actually needed to wind down the Trust. Later, when the time came to put

---

[2] In executing that independent, stand-alone fraud scheme, the defendant also necessarily abused the trust placed in him by the United States District Court, which had previously appointed the defendant to act as the Receiver for Forefront Investments.

into motion certain "cost-saving" exercises—e.g., the decision to commence early destruction of documents, thereby making available for dissipation the funds budgeted for subsequent years' worth of document storage—the defendant knew he could rely on Individual A's rapid (but ostensibly independent) assent to the wisdom and propriety of the Trustee's decisions.

The defendant's position in this relationship was clear—as Trustee, he chose who to employ and dismiss (indeed, the defendant had engaged Company A); he was empowered to make financial and operational decisions on behalf of the Trust; and he controlled the Trust's accounts.[3] The defendant's dominant role in his relationship with Individual A continued into the obstruction phase of the defendant's offense conduct, as well—including directing Individual A to craft a companion letter (parroting the defendant's emerging alibi) to accompany the defendant's own misleading missive to the Bankruptcy Court.

While the United States concurs with the Probation Officer's assessment that the defendant's offense conduct did not rise to the level of meriting a "Role in the Offense" enhancement pursuant to § 3B1.1, the defendant's decision to involve another individual in his course of criminal conduct is an aggravating factor that merits a sentence at the high end of the defendant's properly computed guideline range.

### 3. Multiple, Simultaneous Fraud Schemes

The defendant's dissipation of the LFG Trust's assets involved numerous carefully considered steps and enabling actions taken over the course of four-plus years, from creating a

---

[3] While the defendant eventually paid Individual A handsomely for that reliable pliability, this payment (and Individual A's rapid reaggregation of those funds in Individual A's bank account post-exposure) serves to demonstrate the defendant's position as the unquestioned decision-maker in the relationship: as the Trustee, the defendant controlled the Trust's accounts, and so chose what to disburse, when; and when the scheme began to unravel, the defendant reassumed his familiar position of issuing directives to his former subordinate.

fraudulent bank account to creating a padded and misrepresentative wind down budget. The defendant cannot credibly argue that his actions were the result of a momentary lapse in judgment, or the sad byproduct of a particularly stressful time period. Even more concerning, though, is the fact that the defendant's abuse of his LFG Trustee position was—even in its totality—not an aberration.

Several months after the defendant had deposited the first embezzled LFG Trust check into his shadow bank account, he threw into action an entirely independent fraud scheme: this time, targeting a bankruptcy estate (Forefront) for which the defendant had been appointed as the Receiver by the United States District Court some five years earlier. Beginning in approximately March of 2015, the defendant facilitated a negotiated settlement that netted some $23,375 for the Forefront estate. Rather than abide by his legal and ethical responsibilities as the former Forefront Receiver (and subsequently, as the "Debtor Designee"), however, the defendant directed that the settlement check be made out to him, and then deposited those funds—the property of the Forefront estate—into his fraudulent LFG bank account.

The defendant's abuse of his Forefront appointment, and his embezzlement of more than $23,000 from that estate, stood undetected for nearly three years. It took the collapse of the defendant's law firm, and the subsequent investigation into the defendant's dealings as LFG Trustee—and the defendant's fateful decision to repurpose his fraudulent LFG bank account to serve double-duty—to expose the defendant's unrelated, parallel fraud scheme.

In sum, the defendant's offense conduct was long-running, carefully considered, and deliberately executed; it involved an abuse of the Bankruptcy Court's trust and relied upon the defendant's own bankruptcy law expertise; and it encompassed two independent fraud schemes. The defendant's conduct merits a sentence at the top end of the guideline range.

**II.    History and Characteristics of Defendant**

The defendant was born and raised in a middle-class neighborhood in Connecticut. PSR ¶¶ 46, 52. He enjoyed a safe, stable childhood and loving parents; he participated in extracurriculars that included sports, drama, and student government; and he does not report any incidences of abuse, neglect, or trauma in those formative years. PSR ¶ 52. The defendant is married and has two adult children. PSR ¶ 53.

The defendant completed high school in 1975 and graduated from the College of William & Mary in 1983 with a bachelor's degree. PSR ¶ 68. He earned a law degree from William & Mary's Marshall-Wythe School of Law in 1983. *Id*.

The defendant began his law career as an associate at McGuire Woods, and worked later as a partner at the firms of Hazel and Thomas and LeClair Ryan. PSR ¶¶ 72-73. The defendant also worked for a brief period at Randolph Square IP as that entity's chief administrator and general counsel. PSR ¶ 71. The defendant's license to practice law was revoked in November of 2020, and he is currently retired. PSR ¶¶ 70, 75.

The defendant suffers from hypertension and high cholesterol, and he is prescribed medication for both conditions. PSR ¶ 57. He reports being in otherwise good health. *Id*. The defendant does not have a history of psychological or mental health issues, but he has recently attended individual, marital, and family counseling. PSR ¶ 60. He is prescribed medication for stress. *Id*. The defendant reports having a substance abuse problem as relates to his use of his alcohol to "deal with stress and other problems." PSR ¶¶ 63-66.

To his credit, as reflected in the defendant's Criminal History Score and Category, and accounted for in the advisory sentencing guideline range, the defendant has no criminal record. PSR ¶¶ 39-42.

Unlike many of the defendants that appear before this Court, the defendant's crimes were not borne out of a troubled upbringing, or the limitations that often attend a lack of education, desperate financial circumstances, or a struggle with psychological issues or substance abuse. His decision to engage in a four-year-plus course of criminal conduct is all the more baffling in light of his circumstances and advantages.

### III. Need to Recognize Seriousness of Offense, Justly Punish, Promote Respect for the Law, and Afford Adequate Deterrence

A sentence at the high end of the guidelines, accompanied by the statutory maximum fine, is appropriate in light of the need for the sentence to recognize the seriousness of the defendant's crime, justly punish him for that crime, promote respect for the law and to afford adequate deterrence of criminal conduct.

There is a need for specific deterrence in this case. The defendant's criminal activity, as noted above, was carefully considered and spanned a period of more than four years. During that time, the defendant busied himself in embezzling funds from not one, but *two* bankruptcy estates over which he enjoyed appointed fiduciary positions. The defendant committed fraud in his 50's: embezzling a combined $573,305.22 from the LFG and Forefront estates between January of 2015 and September of 2016, and designing a wind down budget for the LFG Liquidation Trust that contained misrepresentations designed to facilitate future dissipations. The defendant committed fraud and obstruction in his 60's: embezzling a further $240,000 from the LFG estate by claiming a duplicative fee payment from the Trust in February of 2018; executing some $3.2 million in transfers of LFG Trust assets to himself and others between January of 2018 and April of 2019; and engaging in a course of deliberately obstructive and dishonest conduct following the creeping exposure of his LFG misconduct that began in August of 2019. There is little basis to assume that

the mere fact of the defendant's age will serve to impede his ability to commit future crimes.

General deterrence is perhaps even more important in complex fraud cases such as this one, which are often difficult to detect, investigate, and prosecute. *See e.g.*, *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) ("Because economic and fraud-based crime are 'more rational, cool, and calculated than sudden crimes of passion or opportunity' these crimes are 'prime candidates for general deterrence.'"). A substantial penalty will provide the appropriate disincentives to those contemplating similar crimes. *See e.g.*, *United States v. Morgan*, 635 F. App'x 423, 450 (10th Cir. 2015) ("General deterrence comes from a probability of conviction and significant consequences. If either is eliminated or minimized, the deterrent effect is proportionately minimized."); *United States v. Bergman*, 416 F. Supp. 496, 499 (S.D.N.Y. 1976) (stating that absent a meaningful term of imprisonment, general deterrence—"the effort to discourage similar wrongdoing by others through a reminder that the law's warnings are real and that the grim consequence of imprisonment is likely to follow"—will not be achieved.).

The Court must send the strongest possible message to those who would engage in similar conduct that they will be caught and will be punished to the full extent of the law. A sentence at the high end of the defendant's guideline range, in addition to the statutory maximum fine, accomplishes that goal.

## **CONCLUSION**

For the reasons stated above, the United States submits that a sentence comprising 46 months' imprisonment and a $250,00 fine is just and accounts for the factors set forth in 18 U.S.C. § 3553(a).

Respectfully submitted,

Jessica D. Aber
United States Attorney

_____/s/_____
Thomas A. Garnett
Virginia Bar No. 86054
Assistant United States Attorney
Attorney for the United States
U.S. Attorney's Office
919 E. Main Street, Suite 1900
Richmond, Virginia 23219
Phone: 804-819-5400
Fax:     804-771-2316
Email: Thomas.A.Garnett@usdoj.gov

**CERTIFICATE OF SERVICE**

I hereby certify that on November 8, 2021, I electronically filed the foregoing position with the Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF) to all counsel of record.

I also hereby certify that on November 8, 2021, I emailed a true and accurate copy of this Position on Sentencing to the following:

Patrick H. Raible
United States Probation Officer
Suite 1150
701 East Broad Street
Richmond, Virginia 23219

                /s/
Thomas A. Garnett
Virginia Bar No. 86054
Assistant United States Attorney
Attorney for the United States
U.S. Attorney's Office
919 E. Main Street, Suite 1900
Richmond, Virginia 23219
Phone: 804-819-5400
Fax:    804-771-2316
Email: Thomas.A.Garnett@usdoj.gov