**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division**

| | |
|---|---|
| **UNITED STATES OF AMERICA** ) | |
| ) | |
| **v.** ) | **Case No. 03:21-cr-00079 (JAG)** |
| ) | |
| **BRUCE HOWARD MATSON,** ) | **REDACTED** |
| ) | |
| **Defendant.** ) | |
| _____ ) | |

**DEFENDANT BRUCE HOWARD MATSON'S
MEMORANDUM IN AID OF SENTENCING**

COMES NOW the defendant, Bruce Howard Matson, by and through undersigned counsel, and in accordance with 18 U.S.C. § 3553(a) and § 6A1.2 of the United States Sentencing Guidelines ("U.S.S.G." or "Guidelines"), respectfully submits to this Honorable Court his position with respect to sentencing. As the Court is aware, Mr. Matson entered a pre-indictment guilty plea to a felony information charging him with one count of obstructing an official proceeding in violation of 18 U.S.C. § 1505. The parties agree that the advisory Guidelines range is 37 to 46 months of incarceration. The only matter before the Court is to determine a sentence that is "sufficient but not greater than necessary" to comply with the directives of 18 U.S.C. § 3553(a). Mr. Matson submits that a 37-month sentence adequately reflects the seriousness of his conduct and appropriately accounts for (1) his acceptance of responsibility, (2) his complete satisfaction of restitution prior to sentencing, (3) the treatment of his co-conspirator, and (4) conduct that is not reflective of Mr. Matson's life and character described best by those who truly know him.

**INTRODUCTION**

Bruce Matson has had a tremendous fall from grace. He was once a successful, widely respected bankruptcy attorney of more than 30 years. He was an elder and leader of his church

and was deeply involved in the community.  At the age of 64, this matter represents his first and only contact with the criminal justice system and he has led an otherwise law-abiding life.  He has been disbarred and has tarnished his once-stellar reputation in the community.  He stands before the Court not only humiliated and ashamed but with steadfast contrition.

Mr. Matson acknowledges and accepts responsibility for all that he has done.  ████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████

Indeed, Mr. Matson recognizes that he alone is responsible for engaging in the criminal conduct that resulted in his guilty plea.  He does not seek to minimize his responsibility for the harm his actions have caused.  To the contrary, Mr. Matson has undertaken extraordinary measures to accept prompt responsibility for his crime, pay restitution and begin the lengthy process of making amends.

When Mr. Matson appears for sentencing on November 22, 2021, the Court must determine a sentence that is "sufficient but not greater than necessary" to satisfy the purposes of federal sentencing given the unique circumstances of this case.  18 U.S.C. § 3553(a).  As the Presentence

Investigation Report ("PSR") reflects, Mr. Matson is 64 years old and his Criminal History Score is I.  Mr. Matson engaged the undersigned counsel and directed counsel to self-report relevant information that was not known to the government and that formed the basis for his conviction, and to cooperate fully with the government.  He has voluntarily surrendered his license to practice law.  We therefore respectfully submit that a 37-month sentence is sufficient, but not greater than necessary, to achieve the purposes of federal sentencing.

## ARGUMENT

As the Court is aware, *United States v. Booker*, 543 U.S. 220, 226 (2005), rendered the United States Sentencing Guidelines purely advisory.  The applicable advisory Guidelines range now is merely one factor that the Court must consider when imposing a sentence, and the Court "may not presume that the Guidelines range is reasonable." *Gall v. United States*, 552 U.S. 38, 50 (2007).  The Court's duty is to consider all of the factors identified in 18 U.S.C. § 3553(a) and to "impose a sentence sufficient, but not greater than necessary" to comply with the purposes of sentencing set forth in the statute.  *See* 18 U.S.C. § 3553(a)(2).   Mr. Matson asks the Court to impose a sentence of 37 months of incarceration, as explained below.

### I.      The Advisory Guidelines Range

The first step in post-*Booker* federal sentencing requires the Court to calculate the applicable advisory Guidelines range.  The statutory maximum punishment for Mr. Matson's offense is 5 years of imprisonment, a fine of $250,000, a special assessment of $100, and up to 3 years of supervised release.  The parties do not dispute that the applicable base offense level is 6. The parties also agree that there should be an 18-level increase to the base offense level under U.S.S.G. § 2B1.1(b)(1)(J) because the loss amount is more than $3,500,000; a 2-level increase under U.S.S.G. § 2B1.1(b)(2)(A)(i) because the offense involved 10 or more victims; a 2-level

increase under U.S.S.G. § 2B1.1(b)(9) because the defendant made misrepresentations during a bankruptcy proceeding, and a 2-level increase under U.S.S.G. § 3B1.3 because the defendant abused a position of public or private trust.  The parties also agreed that there should be a 6-level decrease pursuant to U.S.S.G. § 2J1.2.  The parties have further agreed that a 3-level decrease is warranted under U.S.S.G. § 3E1.1 in light of Mr. Matson's acceptance of responsibility.  This brings the total offense level to 21, which carries a range of 37 to 46 months.

Mr. Matson asks the Court to find that, given the unique and compelling circumstances of this case, a sentence at the low end of the sentencing range is adequate to serve the purposes of federal sentencing and accounts for his full acceptance of responsibility, extraordinary restitution, and very low risk of recidivism.

## II.    The Other 18 U.S.C. § 3553(a) Factors

With the foregoing in mind, we turn to the remaining factors relevant to sentencing under 18 U.S.C. § 3553.  The "formidable responsibility" of arriving at a fair and just sentence requires the "court to consider, with great care and sensitivity, a large complex of facts" and cannot be "reduced to the mechanical adding-up of a small set of numbers artificially assigned to a few arbitrarily-selected variables."  *United States v. Gupta*, 904 F. Supp. 2d 349, 350 (S.D.N.Y. 2012). In the post-*Booker* era, the sentencing court's duty is to consider all the factors identified in 18 U.S.C. § 3553(a) and "impose a sentence sufficient, but not greater than necessary" to comply with the four purposes of sentencing set forth in the statute.

Those four purposes are the need for the sentence imposed to: (1) reflect the seriousness of the offense, promote respect for the law, and provide just punishment; (2) afford adequate deterrence to criminal conduct; (3) protect the public from further crimes of the defendant; and (4) provide the defendant with needed training, medical care, or other correctional treatment in the

most effective manner.  18 U.S.C. § 3553(a)(2).  In addition, § 3553 requires the sentencing court to consider the following factors (in addition to the advisory Guidelines range and any pertinent policy statements issued by the Sentencing Commission) in imposing sentence: (1) the nature and circumstances of the offense and the history and characteristics of the defendant;  (2) the kinds of sentences available; (3) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (4) the need to provide restitution to any victim(s).  18 U.S.C. § 3553(a)(1)-(7).

### A. The Nature and Circumstances of the Offense

As evidenced by his pre-indictment guilty plea, Mr. Matson accepts complete responsibility for his misconduct.  The nature and circumstances of his offense are undisputed and are aptly described in the offense conduct portion of the PSR and the Statement of Facts submitted in support of his guilty plea.

While the PSR and Statement of Facts present the relevant facts necessary to support the conviction, we offer the following information not to diminish Mr. Matson's responsibility, but to provide some context for the Court's determination of an appropriate sentence.

The crux of Mr. Matson's crimes flow from his work as a bankruptcy trustee in the LandAmerica matter.  LandAmerica was one of Richmond's largest corporations.  The company traded on the New York Stock Exchange and its shares peaked at $106 a share in June 2007.  As the housing crisis grew in November 2008, the company's shares halted trading and plummeted such that any equity interests became worthless. When LandAmerica filed for bankruptcy, over a billion dollars was claimed by creditors.  The complexity of unwinding LandAmerica required hundreds of lawyers, accountants and other professionals working thousands of hours.

This litigation was often contentious and complex.  A cursory review of the docket reveals hundreds of objections by interested parties that both the trustee and the bankruptcy court had to address.  Accordingly, when Mr. Matson was appointed trustee for LandAmerica, he had a Herculean task ahead of him and he achieved an unprecedented result for creditors.

When selected to be the liquidation trustee, the financial advisors in the case projected that creditors would receive a dismal 30 cents for each dollar owed by LandAmerica.  Mr. Matson made significant recoveries from the sale of assets, the pursuit of litigation claims and other activities to ultimately provide $500 million and a staggering 80 cents on the dollar to creditors— delivering almost $300 million more in distributions than anticipated. This was, and is, an extraordinary result.  The magnitude of this result was not lost on Judge Kevin R. Huennekens, who stated at a January 12, 2016, hearing:

> [C]ongratulations to you, Mr. Matson, and the results that you have achieved in this case have been absolutely [nothing] short of marvelous, given where we started in this case.

Even after concern first arose surrounding the funds at issue and leading to Mr. Matson's conviction, Judge Huennekens continued to recognize his achievements.

> [T]his has been a very successful case.  Everything has gone much better than anybody could ever have hoped for in the beginning.  And for those of us who lived through the beginning of this case, this is just a spectacular result.  And nobody can dispute that.

Ultimately, Mr. Matson transferred nearly $2.9 million from the estate to Individual A and himself, which funds they placed in their personal bank accounts.  When questions arose about the transactions, Mr. Matson appeared before the Bankruptcy Court and lied about his conduct, even though, by that time, Mr. Matson had already recovered the $2.9 million.  Thus, although the money was quickly replaced, this conduct rapidly led to the implosion of Mr. Matson's once-stellar legal career and overshadowed the unprecedented result he achieved for LandAmerica's creditors.

Mr. Matson's conduct was and is inexcusable. Nothing he has done or will do going forward can ever change that fact, and we do not endeavor to suggest otherwise. Mr. Matson took immediate steps to atone for his misconduct. He voluntarily resigned from the bar. He engaged undersigned counsel whom he directed to disclose critical information about his conduct that was not then known to the government, to cooperate fully, and eventually to negotiate a resolution with the Office of the U.S. Attorney. During that process, and beginning prior to pleading guilty, Mr. Matson worked with the government to make certain that all restitution was made.

While his extraordinary efforts to pay restitution do not excuse his conduct or lessen the seriousness of the offense, they present a substantial mitigating factor that the Court should consider. The need to provide restitution is a statutorily-recognized factor to be considered at sentencing. *See* 18 U.S.C. § 3553(a)(7). Extraordinary efforts to make early restitution constitute a valid basis for a departure or variance and can be considered by the Court when fashioning a sentence.[1] *United States v. Hairston*, 96 F.3d 102, 108 (4th Cir. 1996) (holding that "restitution, although taken into account in the guideline permitting a reduction for acceptance of responsibility, can provide a basis for a departure when present to such an exceptional degree that it cannot be characterized as typical or 'usual'" (citation omitted)). Whether restitution in a particular case is extraordinary turns on factors such as the percentage of funds restored, the extent of the defendant's efforts at restitution, voluntariness, timing, and motive. *Id.* at 108–09; *see also United States v. Kim*, 364 F.3d 1235, 1244 (11th Cir. 2004) (explaining that, to determine whether restitution is extraordinary, "courts have looked to a wide range of factors, such as the degree of

---

[1] The cited cases discuss the granting of a downward departure based on payment of restitution. To be clear, we are asking that the Court consider Mr. Matson's extraordinary restitution efforts to sentence him at the low end of the advisory Guidelines range.

voluntariness, the efforts to which a defendant went to make restitution, the percentage of funds restored, the timing of the restitution, and whether the defendant's motive demonstrates sincere remorse and acceptance of responsibility").[2]

Here, we recognize the seriousness of the conduct, but ask the Court to weigh heavily that all restitution obligations have been settled to the satisfaction of the government and the successor bankruptcy trustee. ████████████████████████████████

████████████████████████████████████████████████████████

████ Despite significant wrongdoing, Mr. Matson did not use the money to fund a lavish lifestyle.  He promptly repaid the bulk of the funds and has since worked with the government and the successor trustee to ensure full payment of all remaining restitution.  We respectfully submit that these facts are outside of the heartland of cases and provided a sound basis for a sentence at the low end of the applicable Guidelines range.  *See United States v. LeRose*, 219 F.3d 335, 341

---

[2] *See also United States v. Broderson,* 67 F.3d 452, 458–59 (2d Cir. 1995) (affirming a district court's downward departure based in part on the defendant's restitution even though it could be justified "only as a 'discouraged departure'" given that, "[o]rdinarily, payment of restitution is not an appropriate basis for downward departure under Section 5K2.0 because it is adequately taken into account by Guidelines Section 3E1.1"); *United States v. Lieberman*, 971 F.2d 989, 996 (3d Cir. 1992*)* (affirming a district court's downward departure on the basis of the defendant's acceptance of responsibility as primarily demonstrated by his restitution); *United States v. DeMonte,* 25 F.3d 343, 346 (6th Cir. 1994) (stating that "we have acknowledged that *voluntary* restitutionary payments may constitute 'exceptional circumstances' that justify a downward departure" (citing *United States v. Brewer*, 899 F.2d 503, 509 (6th Cir. 1990) (emphasis in original))); *United States v. Bean,* 18 F.3d 1367, 1369 (7th Cir. 1994) ("Undoubtedly there are circumstances that would justify using § 5K2.0 to [depart downward on the basis of restitution] beyond [the] two levels [of reduction provided by § 3E1.1]."); *United States v. Oligmueller,* 198 F.3d 669, 672 (8th Cir. 1999) (affirming a district court's downward departure on the basis of extraordinary restitution because "[w]e have previously held that cases can fall outside the heartland when there are extraordinary efforts at restitution" (citing *United States v. Garlich,* 951 F.2d 161, 163 (8th Cir. 1991)); *United States v. Miller,* 991 F.2d 552, 553–54 (9th Cir. 1993) (holding that district courts may depart downward on the basis of restitution when it (1) "shows acceptance of responsibility," (2) "was substantially greater than that contemplated by the Commission when drafting section 3E1.1," and (3) "the magnitude of the departure [is] commensurate with the level of the defendant's acceptance of responsibility").

(4th Cir. 2000) (describing with approval a recent case where the Eighth Circuit upheld a departure because, in part, the defendant began making restitution payments one year before the indictment and ultimately paid nearly everything owed to the victim before sentencing (citing *United States v. Oligmueller*, 198 F.3d 669, 672 (8th Cir.1999)).   We are not requesting a departure, but respectfully submit a sentence of 37 months is appropriate.

### B. Mr. Matson's Personal History and Characteristics

### 1. Upbringing and Family

Bruce Matson is 64 years old.[3]   The son of an electronics salesman and a grammar schoolteacher, Mr. Matson was born in New Haven, Connecticut, the second oldest of four children born to Louis and Edith Matson.  Mr. Matson's mother returned to teaching after many years of raising the family to help pay the college expenses for the four children.

Mr. Matson left Connecticut in 1975 to attend the College of William & Mary to study history and English.  While there, he met his wife of more than 41 years, Cheryl Ann Miante, who was also a student.  Mr. Matson graduated in 1979 and enrolled in William & Mary's Marshall-Wythe School of Law in 1980.  He and Cheryl married in 1981.  Mr. Matson graduated from law school in 1983 and made Richmond his home because Cheryl grew up in Virginia.

During law school Mr. Matson was a John Marshall Fellow and served on the editorial board of the law review (and published both a student Comment and a student Note in the William & Mary Law Review).  Mr. Matson paid for law school by serving as a Head Resident in a college dormitory, a part-time job during school, and summer employment.

---

[3] ███████████████████████████████████████████████████████████████

Mr. Matson and his wife have raised two successful daughters: Brooke, an MD/PhD and medical resident at the University of North Carolina Hospitals and Amy, a CPA and an Associate Director at Apollo Global Management in New York City.  Mr. Matson has always been a devoted husband and father.  He encouraged his children's growth and championed their pursuits, including coaching many of their sports teams.  For almost a dozen years, before the girls began their professional careers, Mr. Matson took each daughter separately, each year, on a father-daughter weekend to secure some special time during a busy life of practicing law and attending school. These weekends involved a sports event, baking lessons, missions work in Guatemala, hiking, theater, or anything they could share together.

### 2. Community Involvement

Mr. Matson was also civic-minded and engaged in many charitable causes in the community.  He was deeply involved in non-profit institutions and organizations including Christ Lutheran Church, the C.S. Lewis Institute, YWCA, Bon Secours, the Virginia State Golf Association, YMCA Training Teams, and Veritas School.

Mr. Matson has been an active member of the Christ Lutheran Church since 1986.  He and Cheryl have devoted much of their free time to church activities and programs.  Mr. Matson studied for six weeks at Oxford in England to become better equipped for teaching and other faith-related endeavors.  He even traveled to India to speak at its national conference on faith in the workplace.

Mr. Matson has served as a trustee and/or a member of the Church Council for most of his years in Richmond.  In addition, he has taught Sunday School for most of the last 12 to 15 years. Bruce also participated in several mission trips to Guatemala between 2007 and 2012.  The focus of these trips was to bring healthcare resources to one of the most remote parts of Guatemala where the indigenous population received little if any other medical care during the year.

In addition, Mr. Matson served as a Special Assistant to the Head of School at the Veritas School, a local private school in Richmond, and chaired the Veritas School Advisory Council. He resigned two years ago to prevent his personal issues and misconduct from tarnishing Veritas' reputation.

### 3. Legal Career

Until recent events, Mr. Matson enjoyed an impeccable legal career that spanned more than 30 years. He started his legal career as law clerk for the Honorable Blackwell N. Shelley, U.S. Bankruptcy Court (1983-84). He then practiced law in Richmond for 35 years, after a brief stint in Norfolk for two years. He began his legal career at a small firm in Norfolk before joining McGuireWoods in 1986.

In 1994, he joined LeClairRyan when it was in its infancy. During his tenure at the firm, Mr. Matson held a number of significant roles including the Bankruptcy Practice Area Team Leader from 1996 to 2012, which he grew from three attorneys to over twenty. He also served as a member of the Management Committee from 1994-2012. During this time, he initiated a Social Responsibility & Community Involvement Committee, which was in effect a very early Environmental, Social, and Governance ("ESG") effort. For instance, as Chair of that committee he led the effort to build a Habitat-for-Humanity house in every city where the firm operated. The firm successfully completed five builds before Mr. Matson left firm management.

As an attorney, Mr. Matson regularly received recognition as among the Best Lawyers in the United States, the Virginia Legal Elite, and Richmond's Super Lawyers. He served as an Adjunct Professor at the University of Richmond Law School for 10 years and was well regarded by his peers and students. In 2010 he was recognized as a Leader in the Law, which the Virginia Bar Association states recognizes attorneys "for changing the law, serving the community,

changing practice or improving Virginia's justice system, among other accomplishments." Of course, given his actions here, his reputation in his chosen profession is irreparably damaged and he will never be in a position of trust again. We ask the Court to consider this consequence of his actions when fashioning a sentence.

Mr. Matson suffered additional collateral consequences as a result of his conduct. He served as a Director for Apple REIT [NYSE: "APLE"] and its predecessor companies from 1995 to 2019, where he served on the Compensation Committee and the Executive Committee. He also chaired the Governance Committee, where he advanced the company's approach to and compliance with ESG (as described above). He resigned two years ago to prevent his personal issues from adversely impacting the company.

### 4. Collision of Work Stress/Unique Family Circumstances/Medical Issues

In his letter to the Court, ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ These findings and conclusions do not excuse the conduct but help to explain why an otherwise law-abiding man with a solid reputation engaged in this behavior.

███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ Mr. Matson was required to travel

12

frequently between Richmond and Florida to tend to those significant issues, and to administer his father's estate. ███████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

████████████████████████

     The personal stress and demands on Mr. Matson paralleled the professional ones. Significantly, LeClairRyan asked Mr. Matson to become Chief Legal Officer of the firm at a very difficult time for the firm. The firm grew rapidly and quickly rose from a boutique practice to a national law firm with 21 offices in the United States and over 400 attorneys. Mr. Matson played an integral role in guiding the firm through challenging issues faced by a rapidly growing business, including difficult personnel, a significant malpractice claim against the firm, and other disputes, all while facilitating the creation of a properly-structured legal department (as well as establishing important policies and protocols) for a growing business. Mr. Matson and other lawyers at the firm lived with the anxiety of impending financial doom. Partners began to leave, and employees were laid off. Although Mr. Matson had opportunities to leave the firm for more stability, as Mr. LeClair states in his letter, Mr. Matson remained loyal to the firm. All of these factors weighed heavily on him during these events. By the end of 2016, Mr. Matson was no longer involved in firm management. LeClairRyan ceased operations in 2019.

     At the same time and preceding his family obligations in Florida, the years-long financial stress on LeClairRyan and ultimate collapse had a direct impact on him. During that time, the SEC asked Matson to serve as receiver in a significant Ponzi-scheme case in northern Virginia. He had no time to take on the new matter, but his partner and the firm needed the work, so he thought he could juggle that ball as well as the others already beating down on him. If these tasks

13

and demands were not enough, as General Counsel of a new business venture, Mr. Matson was occupied more than full-time as this start-up attempted to close a substantial financing while he mediated an internal management dispute between two of his fellow officers.

███████████████████████████████████████████████████████████████

██████████████████████████████  The significant personal and professional stress also aligns with the period of Mr. Matson's misconduct (2015 to 2019).  His mishandling of funds belonging to the Forefront estate is a prime example of this.  Mr. Matson pursued litigation to collect on a judgment that belonged to the Forefront estate and then deposited the funds into his personal account in September 2016.  While the Forefront bankruptcy case closed in 2011, it was not until five years later, during this period of personal and professional turmoil, that Mr. Matson misappropriated the Forefront money.

The above events left Mr. Matson feeling insecure, including about his family's financial security.  We respectfully submit that this storm of events led an otherwise law-abiding man to engage in wrongful conduct.  It also should be noted that none of the funds at issue were dissipated and were promptly repaid.  This does not justify or excuse his conduct, but we ask this Court to consider these factors as a basis for a sentence at the low end of the Guidelines.

### 5. Character letters[4]

Despite the seriousness of the conduct before the Court, more than 50 members of the community have rallied behind Mr. Matson to provide the Court with valuable perspective on Mr. Matson's kindness, generosity, and spirit.  These letters, and the anecdotes therein, are truly indicative of Mr. Matson's character.  The letters have a common theme—that in addition to

---

[4] The character letters excerpted in this section are attached in full as Exhibits 1–3.

contributing much to the community, Mr. Matson is willing to help people in their time of need without reservation and that he, despite this conduct, is an honorable man.

Gary LeClair, Co-Founder/Chairman of LeClairRyan, observes that Mr. Matson made constant sacrifices to support the firm and community while mentoring employees.  Mr. LeClair described Mr. Matson as a generous and loyal partner to the firm:

> [O]n more than one occasion, he declined highly lucrative offers from other firms to leave our firm, but each time, he chose loyalty to colleagues.  During a season of shortages, for example, Bruce was one of a very small group that dipped into their own assets to fund the firm's annual 401K contribution.  Bruce also conceived and convinced the firm to implement a "Corporate Social Responsibility Policy," which led to the firm more formally supporting the communities in which we practiced, including building Habitat for Humanity houses and doing various other charitable activities in those communities.

He is also aware of the significant stress that Mr. Matson faced over the past few years and notes that the instant offense is "totally out of character," adding that "[d]uring conversations with Bruce in late 2018, I became concerned that Bruce was not compartmentalizing his family stresses.  The top tier respected and trusted partner that I had known now was not himself and appeared scattered and, in my view, deeply distracted and overly stressed."

Bonnie Lenox has known Mr. Matson for 35 years.  She describes him as a mentor who helped develop her career as a paralegal.  Ms. Lenox writes that he was also a strong advocate for women.  She attests to Mr. Matson's commitment to *pro bono* work and recalled how he helped a couple stay in their mobile home and fight foreclosure for 13 years, all as an [unintended] *pro bono* undertaking by Mr. Matson.  When a young associate was diagnosed with Hodgkin's disease, Mr. Matson made sure that his job was secure, work expectations adjusted, and even helped arrange for meals and babysitters to go to the family home so the associate's wife could be present for his treatments.

15

Like Ms. Lenox, Kim Lord (Mr. Matson's only other assistant in 35 years) described him as a mentor, giving her a chance to (and actively helping her) develop the skills to take on paralegal work (and the critically important and commensurately higher compensation).  Ms. Lord writes, "I am a African/American woman and have been a single mom for over 24 years.  Moreover, for most of that time I also supported my mother.  The chance to become a paralegal was very important to me.  Not only did it permit me to develop new skills and advance, but the increase in compensation was material.  So material, it essentially made the difference as to whether I could support my family."

Fellow Christ Lutheran Church member Gerald Ransone describes Mr. Matson as an indelible contributor ready to support in any way the church calls upon him.  "I have served with him at Christ Lutheran Church in every way possible on many committees:  Church Council; Fund Raiser projects; an usher, and a greeter.  He was also a Trustee for our church.  Although there's almost no end to the projects and contributions he has done for our church, he stands out in particular the last ten years as a regular Sunday School teacher."

Ransone likens Mr. Matson to the church's "Good Samaritan" who could be called upon to help a church family or participate in an activity.  He recalls Mr. Matson taking on a legal matter for an indebted family with no means to pay for legal services.  He resolved the debt by negotiating a smaller sum and then personally paying the debt.

Robert B. Light is a 95-year-old elder of the Christ Lutheran Church, who has known Mr. Matson for more than 40 years and details Mr. Matson's significant service to the church, including as an usher, a trustee, and a teacher.  Mr. Matson was instrumental in chronicling the history of the church, and he served on a state-wide committee for two years on the feasibility of bringing a Lutheran retirement committee to the Richmond area.

16

Jaime Stack was employed as the Benefits Manager at LeClairRyan and has worked with Mr. Matson on a plethora of projects. Due to those experiences, Stack fondly remembers the respect and support Bruce has shown her as a woman in this profession. She notes:

> I had a very hard time acclimating to the operations of a law firm. The staff, and particularly women hired into professional roles, were consistently treated like second class. . . . Bruce, in his capacity as a leader at the Firm, truly listened to my complaints and ideas and helped me navigate the difficult path in making several changes. With his mentorship, I was able to push an agenda of equalizing contribution rates for the benefit plans (prior to ACA and moving to self-insured status), implementing Paid Family Leave for all employees, creating a wellness committee, and granting bonuses to staff who went above and beyond in their roles, to name a few accomplishments. Bruce also took an active role in my advancement . . . .

William Broscious is an attorney and bankruptcy trustee who has known Mr. Matson for 35 years. He indicates that in his professional encounters with Mr. Matson he "came away with lessons that improved [his] law practice. He is among a handful of excellent attorneys who helped shape me for the privilege of serving the legal needs of my clients." He notes that Mr. Matson was always particularly kind and patient with unsophisticated debtors. "Bruce was known to the debtor bar as having uncommon patience and respect for the parties before him—treating the anxious and embarrassed debtors with dignity and respect."

Mr. Matson is widely known to have played a large role in the development of many people's careers and professional lives. Sandra Hanna, an attorney in Washington D.C., developed a unique friendship and professional relationship with Mr. Matson after working with him on the LandAmerica matter. Ms. Hanna notes, "He followed my advice, trusted my judgement, and over the course of a long government investigation, came to value my opinion—a too infrequent experience for a woman of color at a large firm." Further, Ms. Hanna notes that Mr. Matson helped her with her career, but emphasizes "lawyers often support each other's careers and I certainly have had other supporters in my career and personal life. But not one of them fits his profile or

17

has such diametrically opposed political views from mine.  And if I am honest about it, the legal profession is really only starting to recognize that it has not done a good enough job in supporting women of color.  Bruce was way ahead of the curve there, and I am grateful for it."

Ms. Hanna also writes that while working on the case, Mr. Matson was there for her when she was diagnosed with breast cancer.  "That is when our real friendship began.  Bruce frequently called to see if I needed anything and met me for lunch when I needed to get out of the house.  The care and compassion he showed me speak volumes about him as a person.  He sought nothing in return for getting me through this difficult time in my life."  Anecdotes like this are indicative of Mr. Matson's true character.

Michael Hern and Bruce Matson met during their first year of law school at William & Mary.  They share a 40-year friendship, and were law partners at one time.  It is notable that someone so entrenched in Mr. Matson's professional life would write with such fervor about his service to others.  Mr. Hern describes Mr. Matson's commitment to caring for others: "When I had health challenges, Bruce was always the first one on my doorstep."

Carl Meyer and Mr. Matson met during Carl's first year at William & Mary.  Mr. Meyer notes (accurately, Mr. Matson would concede) that "no one" (other than Cheryl) knows Mr. Matson better than him.  He described Bruce's friendship, in part:

> As you can imagine, this has been a horrible year for Bruce. It has also been a horrible one for ███████████████████████████ I really needed Bruce's friendship this past 15 months and he has certainly been there for me and my family.  Living nearby, we have had many long walks together.  What I find so admirable about my friend is that during a time when he could rightly use the excuse that he had too many problems of his own with which to contend to help me as much as he would like, Bruce runs to his friend's rescue.

Tinky Keen has also known Mr. Matson and his family for 40 years through their involvement in Christ Lutheran Church.  Although Mr. Matson is involved in many aspects of his faith, his commitment to education stands out for Ms. Keen, who states:

> Bruce's commitment to study and sharing in our Christian education ("Sunday School") has been truly extraordinary.  It's not just his willingness to teach, but the preparation work and passion in sharing.  Bruce often created his own curriculum materials, which I know took considerable effort.  And, when people knew Bruce was teaching, they knew the class would be exceptional—because of his preparation, passion, and skills to teaching. Attendance was typically highest for his classes.

As Ms. Keen also shares, "Mr. Matson often volunteered with a medical ministry group out of Lewisburg, PA that served one of the poorest and most remote native villages of Guatemala."

Mr. Matson is also deeply and fundamentally committed to helping his family.  Jennifer Halloran, Mr. Matson's youngest sister, describes him as a "lifeline" for not only herself ▮▮▮

19

Mr. Matson's commitment to helping his siblings has strengthened his family in times of unimaginable sorrow.

We ask the Court to consider the letters submitted on his behalf and the powerful evidence attesting to Mr. Matson's true nature.

20

### III.    A Sentence of 37 Months Would Satisfy the Purposes of Sentencing

A criminal sentence must be designed with consideration of the seriousness of the offense, the need to promote respect for the law and provide just punishment, the need to provide the defendant with needed medical care, and the goals of providing deterrence and protecting the public.  18 U.S.C. § 3553(a).  It must also be "sufficient but not greater than necessary" to serve these purposes.  *Id.*  In light of the facts of this case, a sentence of 37 months of incarceration is sufficient to meet all of the goals set forth in § 3553(a)(2).

With respect to the retributive purpose of sentencing, we note that this case has already had devastating consequences for Mr. Matson and his family.  He has surrendered his law license and will never work as an attorney—the only career that he has known—again.  Given the notoriety of this case, he is virtually unemployable.  Mr. Matson's reputation in the community is irreparably harmed and he has lost both friends and relationships with colleagues as a result of his crime.  Along with these consequences, we respectfully submit that a sentence of 37 months of incarceration is sufficient for Mr. Matson to repay his debt to society.

Regarding specific and general deterrence, there is no question that Mr. Matson appreciates the seriousness of his offense and has accepted complete responsibility for his actions.  At 64 years old, and in light of his disbarment, he presents no risk of recidivism, another factor relevant to sentencing under § 3553.[5]  *See, e.g. United States v. Hamilton,* 323 F. App'x 27, 31 (2d Cir. 2009) (finding "the district court abused its discretion in not taking into account policy considerations with regard to age recidivism not included in the Guidelines"); *United States v. Holt*, 486 F.3d

---

[5] Additionally, offenders in Criminal History Category I have a recidivism rate of 13.8%.  *See* U.S. Sentencing Comm'n, *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines,* at 21–30.  For those over age fifty at the time of sentencing, the rate in Category I is only 6.2%.  For all Category I defendants convicted of fraud, the recidivism rate is only 9.3%.

997, 1004 (7th Cir. 2007) (affirming a below-guideline sentence based on the defendant's age, which made it unlikely that he would again be involved in a violent crime); *United States v. Nellum*, 2005 WL 300073, at *3 (N.D. Ind. Feb. 3, 2005) (granting a variance to a 57-year-old defendant because recidivism drops with age).   A strong message of both specific and general deterrence has already been sent in this case as a result of the publicity surrounding it and because of Mr. Matson's prominence in the community.   This publicity will certainly continue, if not intensify, after sentencing and the strong deterrence message will be unmistakable if the Court imposes a 37-month sentence.[6]

With respect to the fourth stated goal of sentencing, rehabilitation, a sentence of 37 months is undoubtedly adequate to afford Mr. Matson the time and opportunity he needs to achieve rehabilitation.   Mr. Matson is prepared to take full advantage of the treatment options available to him while incarcerated.

In light of the above, we respectfully submit that, in the context of Mr. Matson's family-and-community-oriented life, his advanced age, his pre-indictment admission of wrongdoing, and the extraordinary efforts towards restitution, a sentence of 37 months incarceration will adequately recognize the seriousness of the offense, promote respect for the law, and provide deterrence and just punishment.

---

[6] There is no empirical evidence demonstrating a relationship between sentence length and general or specific deterrence, regardless of the crime.  *See* Andrew Von Hirsch et al., *Criminal Deterrence and Sentence Severity: An Analysis of Recent Research* (1999) (concluding correlations between sentence severity and crime rates are statistically insignificant).   Moreover, the Sentencing Commission has found no correlation between recidivism and Guidelines' offense levels.  *See* U.S. Sentencing Comm'n, *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines* at 15 (2004).   Instead, research demonstrates that "increases in severity of punishment do not yield significant (if any) marginal deterrent effects."   Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime and Just. 1, 28–29 (2006).

## IV.     A 37-Month Sentence Would Avoid Sentencing Disparity

During Mr. Matson's plea hearing, the Court, after reading the statement of facts, naturally asked the government whether the Court should expect charges against any other individuals. Although the government equivocated at the time, the answer is no.   We understand the government will not charge Mr. Matson's co-conspirator, "Individual A."   Individual A is a lawyer and CPA and, through his prior company, served as Mr. Matson's financial advisor for the LandAmerica bankruptcy.   While Individual A should also receive credit for the success of the LandAmerica bankruptcy and the incredible recovery for creditors, he too was complicit in a significant portion of Mr. Matson's misconduct.   Along with Mr. Matson, Individual A inflated the winddown budget, unlawfully accepted a self-described bonus of $1.5 million, and then lied to the bankruptcy court to cover it up.   In fact, Individual A is mentioned more than 40 times in Mr. Matson's PSR.

The government undoubtedly has the prosecutorial discretion to charge or, as in this case, not charge a co-conspirator.   Mr. Matson does not take any issue with the government's exercise of that discretion.   And Mr. Matson pled guilty because he is guilty.   However, the fact that Individual A was not charged (and as a result is not a felon, does not face incarceration, has maintained his bar and CPA licenses, and has not been publicly shamed), is relevant to this Court's determination of the appropriate sentence for Mr. Matson.

A sentence of 37 months is also consistent with sentences of defendants with similar records who have been found guilty of similar conduct.   Counsel submits the examples below to demonstrate that a sentence of 37 months is in alignment, on a national level, with other federal sentences that have been imposed in cases involving similar facts.

- *United States v. Knorr*, Case No. 2015-cr-00398 (E.D. Penn. 2016). In April 2019, defendant Amanda Knorr was sentenced to thirty months in prison and five years of probation, and ordered to pay $54 million in restitution, after she pleaded guilty in connection with a Ponzi scheme believed to be the biggest clean energy scam in American history. Knorr and a co-defendant founded a company, Mantria Corp., that raised more than $54 million from over 300 investors based on promises that they could earn high returns by investing a clean energy product known as "biochar." In truth, the supposed investment was based on a fictitious scientific methodology.

- *United States v. Stopchinski*, Case. No. 2010-cr-00252 (E.D. Va. 2011). The defendant Mark Stopchinski perpetrated a sophisticated scheme to defraud health insurance customers into also purchasing life insurance and used the identities of his employees to avoid tax liability on the fraudulent commission payments. His conduct included forging his own employees' names and social security numbers so they would bear the tax liability of the commissions. The fraud persisted for 12 years despite two prior administrative orders to "cease and desist." At sentencing, the Court varied from the advisory Guideline range of 78 to 97 months and sentenced the defendant to 36 months plus restitution.

- *United States v. Owen Li,* Case No. 2015-cr-00870 (S.D.N.Y. 2015). The district court sentenced Mr. Li to two years' probation and restitution in the amount of $56.8 million after he pleaded guilty to one count of securities fraud and one count of making a materially false statement for lying to investors and the SEC regarding the performance of his hedge fund, Canarsie Capital, LLC.

- *United States v. Poticha,* Case No. 2018-cr-00208 (N.D. Illinois): The 73-year-old defendant, Barry Poticha, pled guilty to one count of conspiracy to defraud the United States. From 2000 through December of 2011, Mr. Poticha was the office manager and bookkeeper for two temporary staffing companies that shared office space and administrative personnel. Mr. Poticha was responsible for preparing and filing the Quarterly Federal Tax Return forms for each company with the IRS as well as preparing and issuing the W-2 forms. Mr. Poticha falsified information reported in the forms in order to fraudulently reduce or eliminate the employment tax liability of the companies. For tax years 2006 through 2011, the total federal tax loss that resulted from Mr. Poticha's actions was at least $24,450,609. District Court Judge Gary Feinerman sentenced Mr. Poticha to 5 years' probation with the first 36 months to be served on home confinement and restitution in the amount of $341,621 to the IRS and $32,604 to the Illinois Department of Revenue, and a $100 special assessment fee.

- *United States v. Avenatti*, Southern District of New York, Case No. 2019-cr-00373 (S.D.N.Y): Following a three-week jury trial, Michael Avenatti was convicted of defrauding his client and attempting to extort tens of millions of dollars from the athletic apparel company Nike. Avenatti threatened to hold a press conference at which he would announce allegations of misconduct by employees of Nike. However, Avenatti stated that he would only refrain from doing so if Nike made a payment of $1.5 million to his client, who was in possession of information potentially damaging

24

to Nike, and further agreed to "retain" Avenatti and another individual, who was not charged with a crime, to conduct a supposed "internal investigation." Despite neither Nike nor his client requesting any investigation, Avenatti demanded to be paid, at a minimum, between $15 million and $25 million. Alternatively, Avenatti demanded a total payment of $22.5 million from Nike to resolve any claims his client might have and to buy Avenatti's silence. The Court sentenced Avenatti to 30 months.

The above-mentioned cases illustrate that a sentence of 37 months for Mr. Matson, an individual with a Criminal History Score of I who has promptly accepted responsibility and made extraordinary restitution, is consistent with other sentences that have been imposed in similar federal cases.

## **CONCLUSION**

Mr. Matson sincerely regrets and takes full responsibility for his conduct. Mr. Matson asks the Court to fashion a sentence that will punish him but that will also recognize his otherwise meritorious life and the extraordinary efforts to mitigate the harms he has caused. He hopes that, after serving his sentence, he can return to his family and community and re-establish himself as a productive, contributing member of society.

For the reasons set forth above, and any other reasons that may appear to the Court, we respectfully request that the Court impose a sentence of 37 months as it is sufficient, but not greater than necessary, to comply with the statutory directives set forth in 18 U.S.C. § 3553(a).


Dated: November 8, 2021

Respectfully submitted,

BRUCE HOWARD MATSON,
By Counsel


By: _____/s/_____
Brandon M. Santos (VSB No. 75380)
Richard Cullen (VSB No. 16765)
McGuireWoods LLP
Gateway Plaza
800 East Canal Street
Richmond, Virginia 23219-3916
804.775.4745 (v)
804.698.2194 (f)
bsantos@mcguirewoods.com

Danny Christopher Onorato
Schertler Onorato Mead & Sears, LLP
901 New York Avenue, NW
Suite 500 West
Washington, DC 20001
202.628.4199 (v)
202.628.4177 (f)
donorato@schertlerlaw.com
*Admitted pro hac vice*


**CERTIFICATE OF SERVICE**

I hereby certify that on the 8th day of November 2021, I will electronically file the foregoing

with the Clerk of Court using the CM/ECF system, which will then send a notification of such

filing to all counsel of record involved in the case.


/s/ Brandon Santos _____

26